### STORRS and BROOKS *against* BARKER.

A person having the legal title, who acquiesces in the sale of the land by another claiming, or having colour of title to it, is estopped from, afterwards, asserting his title against a purchaser; especially, if he has advised and encouraged the parties to such sale to deal with each other.

Ignorance of the law, with a full knowledge of the facts, cannot, generally, be set up as a defence; nor will it protect a party from the operation of the rule of equity, when the circumstances would, otherwise, create an equitable bar to the legal title.

*June 29th.*

THE bill was for an injunction to stay an action of ejectment, brought by the defendant against the plaintiff, *B.*, to recover the possession of a piece of land, held by the plaintiff, *B.*, under a deed from the plaintiff, *S.* The bill, also, prayed, that the defendant might be decreed to execute to the plaintiff, *B.*, a release of all his right and claim to the land, or for a perpetual injunction against the prosecution of his claim, and for general relief. The material facts, as they appeared in the pleadings and proofs, are stated in the opinion of his Honour the Chancellor.

*H. B. Potter*, for the plaintiffs.

————, for the defendant.

(a) Vide *Brinkerhoff* v. *Brown*, ante, p. 139.

THE CHANCELLOR. The defendant is seeking to enforce his title at law to 6½ acres of land, in the village of *Buffalo*, under the following circumstances, which are supposed, on the part of the plaintiffs, to have created an equitable estoppel.

1822.

STORRS
v.
BARKER.

*John Johnston* devised by will, to his wife *Ruth*, all his real and personal estate, and he died seised of 39½ acres of land, of which the land in question was a part. His wife, after his death, conveyed 33 acres of the land, for a valuable consideration, to the defendant, her father, and then married *Elisha Foster*. She, by will, devised the 6½ acres to her second husband, in consideration of his affection and particular kindness to her during her protracted sickness, and died without issue, in *October*, 1812. This devise to her husband was made with the approbation of her father's family, and there is good ground to conclude, with the approbation of the defendant himself, who mentioned the devise as being just and proper. The defendant and *Foster* lived very near each other, at the time of the death of Mrs. *Foster*, and for a year afterwards, and *Foster* continued to occupy the 6½ acres of land as his own, and claimed the same under his wife's will. In *July*, 1813, he sold the land by a deed, with full covenants, and for a full and valuable consideration, to the plaintiff, *Storrs*; and the defendant, before the sale, which was in a train of negotiation for some weeks, repeatedly advised *Foster* to sell, and *Storrs* to buy. He told *Foster*, that he thought his title good under the will. He was also asked, on behalf of *Storrs*, before the purchase, whether he did not claim the land by inheritance, and he replied in the negative, for that his daughter had made a will. After the purchase by *Storrs*, in the summer of 1813, the buildings on the lot were destroyed by the enemy, and the plaintiff, *S.*, claimed and received compensation for the same from the *United States*. *Storrs* continued to occupy the land as owner, and erected a building on it, in 1814, or 1815, and with

A feme covert seised of land, devised it to her husband, and died without issue, leaving her father, as heir at law; and the husband, as devisee, took possession of the land, and continued to occupy and improve it, with the knowledge of the father; and, afterwards, sold it, by his advice, to the plaintiff, for a valuable consideration; and the father did not pretend, but disavowed any claim to the land as heir to his daughter; and the devise was void by statute: *Held*, that the father was estopped from afterwards asserting his legal title, as heir, against the purchaser, on the ground that he was ignorant, at the time, that the devise was void by statute.

the knowledge of the defendant, who never advanced any claim to the land, as heir to his daughter, until the latter part of the year 1816.

Here, then, is the case of a person knowing and approving, at the time, (as we have good reason to infer,) of his daughter's devise of her small real estate of $6\frac{1}{2}$ acres of land to her second husband, as a token of her affection and remuneration for his kindness ; and of that husband retaining possession, as owner, after his wife's death, with the knowledge and assent of the defendant, and then selling the land to a third person, with the advice of the defendant, who expressly encouraged the one to sell and the other to buy. He afterwards permitted that buyer to make. improvements, and exercise acts of ownership upon the land for the space of three years, before he advanced his claim as heir to his daughter, and founded on the invalidity of her will. If the case rested upon these facts alone, it would fall within the rule of equity, that where one having title acquiesces, knowingly and freely, in the disposition of his property, for a valuable consideration, by a person pretending to title, and having colour of title, he shall be bound by that disposition of the property ; and especially, if he encouraged the parties to deal with each other in such sale and purchase. This doctrine was mentioned in the case of *Wendell* v. *Van Rensselaer*, (1 *Johns. Ch. Rep.* 344.) and is most amply supported by a series of decisions, some of which were referred to in that case. It is deemed an act of fraud for a party, conusant all the time of his own right, to suffer another party, ignorant of that right, to go on, under that ignorance, and purchase the property, or expend money in making improvements upon it. Mr. J. *Lawrence* (6 *Term Rep.* 556.) recollected a case in which Lord *Mansfield* would not suffer a man to recover even in ejectment at law, who had stood by and seen the defendant build upon his land. However we may question the existence of such a rule in a Court of

law, yet in equity it is well established; and it seems to be immaterial whether the real owner was induced to conceal his title, and omit to assert it from fraudulent motives, or from other considerations, which he deemed, at the time, prudential, as was the case with the defendant in *Raw* v. *Pole*, (2 *Vern.* 239.)

But, in this case, the defendant endeavours to withdraw himself from the operation of the rule, by the averment that he mistook the law of the land, and did not know that the devise of a feme covert was void, or that his title was good as heir to his daughter, until late in the year 1816. I am induced, from the proofs in the case, to believe in the truth of the averment; and the question then arises, whether that ignorance of his own title will prevent the application of the doctrine.

The presumption is, that every person is acquainted with his own rights, provided he has had reasonable opportunity to know them; and nothing can be more liable to abuse, than to permit a person to reclaim his property, in opposition to all the equitable circumstances which have been stated, upon the mere pretence that he was at the time ignorant of his title. Such an assertion is easily made, and difficult to contradict. It is rarely, that a mistake in point of law, with full knowledge of all the facts, can afford ground for relief, or be considered as a sufficient indemnity against the injurious consequences of deception practised upon mankind; and if the person, as in this case, is not merely silent and passive, but gives explicit confirmation to the title of the party in possession, and encourages him to sell, and encourages the purchaser to buy, the case is greatly altered, and equity and policy equally dictate, that he, and not the purchaser, ought to suffer. His ignorance of the law ought not to protect him from the operation of the rule of equity. He could easily have dispelled that ignorance, for he had the fact of the will of his daughter before his eyes; and if he may be allowed to

STORRS
v.
BARKER.

*Ignorance of
the law, with
knowledge of
the fact, can-
not generally
be set up as a
defence;  nor
will ignorance
of one's legal
right take the
case out of the
rule, when the
circumstances
would, other-
wise,  create
an  equitable
bar to the le-
gal title.*

plead his voluntary ignorance, in destruction of equitable rights, growing out of his own acts and assertions, the grossest imposition, and the greatest fraud, might be prac-tised with impunity.  It would seem, therefore, to be a wise principle of policy, that ignorance of the law, with knowledge of the fact, cannot generally be set up as a defence ; and it appears to be settled by a course of equity decisions, that ignorance of one's legal right, does not take the case out of the rule, when the circumstances would, otherwise, create an equitable bar to the legal title.

*Dyer* v. *Dyer*, (2 *Ch. Cas.* 108.) is the earliest case on this point.  It came before the Court in *June*, 1682, (*Tri-nity Term*, 34 *Car.* II.) and we have only the statement of the case, raising the point of law, and the argument of counsel, but no decision.  The plaintiff purchased of *J. D.* an annuity or rent charge of £100, which had been settled on *J. D.* by the defendant's father, and which the defendant had continued to pay for twelve years.  While the plaintiff was in treaty to purchase the annuity, he in-quired of the defendant whether there was such a grant, and such payments, and whether it had been revoked. The defendant confessed the grant and payments, and that it had not, to his knowledge, been revoked; and the plaintiff accordingly purchased the annuity at the price of £2,000.  The plaintiff filed his bill to enforce payment, and the defendant set up that the grandfather had made settlements on marriage, by which the defendant's father could not make such a grant, and that these settlements were concealed from the defendant.  The cause was brought to a hearing on bill and answer ; and it was con-tended on the part of the plaintiff, that be the defendant's title what it might, yet he had encouraged and drawn the plaintiff in to purchase, and the plaintiff was not to be hurt.  On the other side, it was stated, that ignorance of a man's title shall not prejudice it, and that the defend-ant was not guilty of any misinformation or concealment ;

and upon this, the Lord Chancellor is reported to have said, that "ignorance of his title differed the case;" and he put off the hearing until a cross bill for discovery of the settlement could be brought on.

The case of *Hobbs* v. *Norton* (1 *Vern.* 136. 2 *Ch. Cas.* 128.) arose about the same time. It is given in *Vernon* as of *Hil.* Term, 1683, before the Lord Keeper *North;* and in *Chancery Cases*, as of *Mich.* Term, *November,* 1682, before the Lord Chancellor *Nottingham.* The former report gives the decree as being pronounced upon a rehearing by the Lord Keeper, and the latter gives no decree or opinion, and only the substance of the pleadings. The facts in this case are so exceedingly analogous to those in *Dyer* v. *Dyer,* that one is strongly induced to think it must be the same, under different names, and which, as we have seen, had been directed, a short time before, to stand over. Be this as it may, it appears that Lord Chancellor *Nottingham* gave no decision on the question, whether ignorance of a man's legal right will protect him against the consequences of encouraging others to deal with his property as their own. The first authoritative decision on this point was made by Lord Keeper *North,* who succeeded to the great seal in *January,* 1683, as Lord *Nottingham's* successor.

The case of *Hobbs* v. *Norton,* was shortly this: A younger brother of the defendant had an annuity of £100, charged on lands, by his father's will, with power of revocation, and he contracted to sell it to the plaintiff, who went to the defendant, and told him he was about to buy the annuity, and desired to know if his younger brother had a good title to it, and whether his father was seised in fee at the time of the will, and whether there was any revocation made. The defendant said, he believed his brother had a good title, and he had paid him the annuity for twenty years, but he had heard there was a settlement of his father's lands before the will, though he had not seen it,

and he encouraged the plaintiff to proceed in his purchase, who accordingly made it, for a valuable consideration. Afterwards, the defendant got possession of the settlement, by which the lands were entailed by his ancestor, and the annuity, as against him, void. The defendant wished to avail himself of this settlement, and there was no proof that, at the time he encouraged the plaintiff to purchase, he had any notice of the settlement. His defence was, that he then knew nothing to the contrary of a good title to the annuity in his younger brother, and that the payment of the annuity, and the acknowledgment of its validity, were innocently made by him, while he was ignorant of his right. The Lord Keeper decreed payment of the annuity, and that the defendant should confirm it to the plaintiff, with an election to the defendant, in a twelvemonth, to purchase it of the plaintiff; and he decided purely on the ground of the encouragement given to the plaintiff to proceed in his purchase, and that " it was a negligent thing in the defendant not to inform himself of his own title." The younger brother was all the while knowing to this settlement, and, therefore, as between him and the defendant, the case, it is said, might admit of another consideration.

This case strikes me as being entirely in point, and it shows that the ignorance of the invalidity of the will of his daughter, put forward by the defendant, as an excuse for the belief and admission of the title of *Foster*, the devisee, does not prevent the application of the rule, that he who encourages another to buy of a third person, a right to which he himself has a title, is to be postponed in equity to such a purchaser.

The fact that the defendant did give such encouragement to *Foster* to sell, and to the plaintiff, *Storrs*, to buy, is abundantly proved. One witness (*J. Landon*) says, he heard the defendant say, he wished *Storrs* would buy the land, as it would be a sale beneficial to both him and

*Foster*, and he requested the witness to advise *S.* to buy; and shortly afterwards, the defendant told him that *F.* and *S.* had bargained for the land, and he was glad of it. Another witness (*B. Caryl*) says, the defendant told him he had advised *Foster* to accede to the terms of sale proposed by *Storrs;* and the defendant had several conversations with him, the witness, concerning the sale, pending the negotiation between *F.* and *S.;* and he advised *S.* to purchase, and uniformly advised the sale by *F.* A third witness, (*Elisha Foster,*) who appears to have been rendered a competent witness by a release from *Storrs,* declares also, that the defendant advised him to sell, and the defendant knew of the sale when it was made; and he told him that he considered his title under the will good. A fourth witness (*J. A. Barker*) states also, that *Caryl*, a partner in trade with *Storrs,* asked the witness about the title to the land, when *S.* was about buying, and wanted to know if the defendant did not inherit the title to the 6½ acres; and the witness thereupon consulted with the defendant, who said he did not inherit it, for that his daughter had made a will; and this information was carried back to *Caryl*, who, as the witness believed, communicated all his information on the subject to *S.*, before the sale.

There is, then, no doubt, from the testimony of these four witnesses, of the fact, that the defendant did actively encourage the sale by *Foster* and purchase by *Storrs*, and did positively admit the right and title of *Foster*.

The decision of Lord Keeper *North*, in *Hobbs* v. *Norton*, was confirmed in subsequent cases, and it has never been overruled or questioned.

In *Hunsden* v. *Cheyney*, in 1690, (2 *Vern.* 150.) the mother was tenant in tail of a term, with a right of disposal, at her pleasure, and she was present at a marriage treaty made by her son, in which he declared that the term was to come to him after his mother's death, and he settled the reversion

of the term, after her death, on the issue of the marriage, and she did not mention or insist that she had more than a life estate in the term. A bill was filed by the son of the marriage, to compel his grandmother to make good the settlement as to the reversion of the term, after her death. She insisted, that she was ignorant of the title, and not guilty of any fraud, and knew not that she was tenant in tail of the term. But, without regarding this excuse, the Lords Commissioners decreed according to the prayer of the bill. So, again, in *Teasdale* v. *Teasdale*, (*Mich.* 1726. *Select Cas. Ch.* 59. 13 *Viner*, 539. pl. 4. 1 *Fonb.* 151. n. S. C.) *B.*, on marriage with *M.*, settled a jointure on her, with the approbation of *A.*, his father, who witnessed the deed. The son died, leaving a large personal estate, and made *M.* his executor. Afterwards, *A.*, the father, discovered that *B.* was only tenant for life, and that the fee was in himself, and he recovered at law. On a bill by the wife, Lord Ch. *King* said, he should make no difference, whether *A. knew of his title or not, at the time,* considering the near relation of father and son. That it was plain it was thought the son had a fee, and had it been known to have been in the father, his joining would have been insisted on ; else, the marriage would not have been had. As *he knew of the settlement*, he should not take advantage of it. The Chancellor decreed the usual jointure to be made upon her, instead of obliging her to resort to the son's covenant, and compel the jointure to be made good out of the personal estate.

It can hardly be supposed, that Lord *King* laid much stress on the circumstance of the relation of father and son ; and if he did, we have here, also, the relation of father and daughter, and the most powerful appeal to the parental feelings of the defendant, and his sense of moral obligation, to hold good the will which his daughter had been prompted to make by the best dictates of the heart, and with the approbation of her father's family, and, if we may

give credit to two of the witnesses, (*Walden* and *Caryl*,) by the encouragement of the defendant himself. The recognition of that will, and of the title under it, and of the transfer of that title, for a series of years, with full knowledge of all the facts, forms one of the strongest cases that can well be presented, for the interposition of a Court of equity to protect that title, and prevent it from being disturbed.

It may be said, that the plaintiff, *Storrs*, was, equally with the defendant, presumed to know, that the will of a *feme covert* was void. There is no evidence of his knowledge, in fact, of the invalidity of *Foster's* title; and, if he had been acquainted with that rule of law, he had good reason to presume, from the acts and conduct of the defendant, that the will of the daughter had been either previously authorized by the defendant, or had received a valid recognition by him since her death. He had a right to consider the defendant's title, as heir, duly waived or abandoned; and, certainly, there is no colour for an inference, that any deception or fraud was practised by *S.*, the purchaser, upon the defendant, so as to affect his right to relief in this Court. But the defendant has questioned the validity of the deed from the plaintiff, *S.*, to the plaintiff, *B.*, by proof, that it was given without consideration, and to defraud creditors. This is not the proper time to determine on the validity of that deed. If the deed be fraudulent and void, as against creditors, it may be good as against the defendant; and the plaintiff, *B.*, either holds the deed in his own right, or as trustee for the creditors of *Storrs*. The title, under *Foster*, is in one of the plaintiffs, and the defendant is equally barred from asserting his legal title against the equity of the case, whether *B.* holds in his own right, or in trust for others.

I shall, accordingly, decree, that the defendant be perpetually enjoined from prosecuting, at law, his right, claim, or title, as heir to his daughter, *Ruth Foster*, to the 6½

1822.

STORRS
v.
BARKER.

acres of land, in the pleadings mentioned, and that no costs of this suit be charged by either party as against the other.

The following decree was entered :

" It is declared and adjudged, that the defendant encouraged and advised the sale, by *Elisha Foster*, and the purchase, by the plaintiff, *L. S.*, of the six and a half acres of land, in the village of *Buffalo*, devised by the will of *Ruth Foster* to the said *E. Foster*, and in the pleadings and proofs mentioned ; and recognised and admitted, the title derived under the said will, and for the space of nearly, or about, four years subsequent to the death of the said *Ruth Foster*, and with knowledge of her will, the defendant acquiesced in the acts of ownership of the said *Elisha Foster*, as devisee under the said will, and of the said *L. Storrs*, as purchaser under the said *Elisha Foster*. And it is further declared and adjudged, that the defendant is in equity concluded and estopped, by those acts and admissions, from asserting his legal title, as heir of the said *Ruth Foster*, to the said six and a half acres of land, against the claim or title thereto, on the part of the plaintiffs, derived under the will of the said *Ruth Foster*, and that the declaration by the defendant of his ignorance, during all that time, of the invalidity in law of the will of the said *Ruth Foster*, if well founded in point of fact, is no sufficient defence against the equitable bar to his legal title, arising from the acts and admissions aforesaid ; inasmuch as, with knowledge of all the facts, he was bound to inform himself of his own title, before he undertook to advise and encourage the sale and purchase of the same land by others, under an adverse title. It is, thereupon, *ordered*, *adjudged*, and *decreed*, &c., that the defendants, and all persons claiming under him, be perpetually enjoined from prosecuting at law, by action of ejectment, or otherwise, his right, claim, or title, as heir to his daughter, *Ruth Fos-*

ter, to the six and an half acres of land, aforesaid, as against the plaintiffs, or either of them, or as against any other person or persons, claiming or possessing the same, by, from, or under them, or either of them, or under any right or title derived from them, or either of them; and the injunction, heretofore issued in this cause, is hereby declared to be perpetual. And it is further ordered, that a copy of this decree be served on the defendant, and on his solicitors, attorneys and counsel, to the end that due obedience may be rendered thereto. And it is further ordered, adjudged, and decreed, that no costs of this suit be charged by either party as against the other."