ORLANDO DAVIDSON

*v.*

TIMOTHY R. YOUNG *et al.*

1. INFANTS.—*their liability for torts and fraud.* An infant is liable in damages for his torts and frauds. If he were to falsely allege himself to be of age, for the purpose of inducing another person to purchase and take a

Syllabus.

deed of his lands, he would be liable to respond in damages for any injury which might result to the purchaser in consequence of the deceit.

2. Infants—*estoppel by reason of fraud.* Whether he would be estopped, in a Court of Chancery, from disaffirming such a conveyance on his arriving at majority, is by no means clear. There seems, however, to be only a technical reason why the doctrine of equitable estoppel should not, in such cases be applied, and in a case of that character, this court would be strongly inclined to hold the infant bound.

3. Same—*of estoppel by consent of the minor.* But an equitable estoppel can not arise out of the mere consent of an infant, unaccompanied by false representations, for the sale and conveyance of his lands by an administrator, who otherwise would have no authority so to do. Such consent could not conclude the infant any more than a sale and conveyance by himself, which he would be at liberty to disaffirm.

4. Same—*of estoppel by silence of infant while improvements are being made on his land by purchaser.* Nor would the owner of the land be estopped merely because of his standing by in silence while improvements were being made thereon by such purchaser, during his minority.

5. Same—*estoppel by asserting ownership of proceeds of such sale.* A portion of the purchase money received by the administrator was invested in other lands which he conveyed to the infant without his then knowledge, but which he afterwards, both before and after he attained his majority, spoke of as belonging to him; but no estoppel could arise therefrom, as only what was said by him in that regard, after his majority, would be important, and that could not have influenced the conduct of the purchaser, even if known to him, because he had already bought and paid for the land and made his improvements.

6. Estoppels *in pais—when they arise.* "The doctrine of estoppels *in pais*, or equitable estoppels, is based upon a fraudulent purpose and a fraudulent result. If, therefore, the element of fraud is wanting, there is no estoppel; as, if poth parties were equally cognizant of the facts, and the declaration or silence of the one party produced no change in the conduct of the other, he acting solely on his own judgment. There must be deception and change of conduct in consequence, in order to estop a party from showing the truth."

7. Same—*application of the rule where one who is of age, is silent upon the consummation of a contract made when he was a minor.* So where a party had purchased lands belonging to an infant, from an administrator who had no authority to sell, and every thing in relation to the transaction was consummated except the making of the deed, the fact that the owner of the land, he having attained his majority, was present on the occasion of the execution of the deed by the administrator to the purchaser, and was silent,

though having knowledge of what was transpiring, would not operate to estop the owner from asserting his title as against such purchaser. In such case there would be wanting the element of deception on the part of the owner and consequent change of conduct on the part of the purchaser, because all the material parts of the transaction had been consummated before, the deed being merely the evidence of what had already occurred.

8. INFANT—RATIFICATION—*what constitutes.* If an infant, after attaining his majority, re-delivers his deed made in infancy, it would be a ratification.

9. In order to constitute a ratification, however, of acts done in infancy, the act relied upon as a ratification, must be performed with a full knowledge of its consequences, and with an express intent to ratify what is known to be voidable.

10. Where a party who had attained his majority, was present and knew that a deed was being acknowledged by another, for the conveyance of his land, which had been sold by the grantor, without authority, during the infancy of the owner, and remained silent, his attention to the transaction not being challenged so as to call upon him for reply, and the circumstances being such as to show he did not participate therein, nothing is to be inferred against him, in the way of intended ratification, from his silence. Ratification must be deliberate, intentional, and unequivocal, and will not be inferred from mere silence under such circumstances.

11. In this case, the administrator who had sold the infant's land without authority, invested a part of the purchase money in another tract of land, which he conveyed to the infant, who, on arriving at age, having repudiated the sale of his land by the administrator, conveyed the land purchased with the proceeds of that sale, as he was directed by the administrator, without in any way profiting thereby. This did not operate as a ratification of the sale of his land by the administrator.

12. But if the infant, on attaining his majority, had conveyed the land to which he had thus acquired title from the administrator, for his own benefit, or in his own right, claiming title thereto; or, if he had in any mode, after he became of age, knowingly appropriated to his own use any of the proceeds of the sale of his own land, that circumstance would give the case a different complexion.

APPEAL from the Superior Court of Chicago.

The case will be found sufficiently stated in the opinion of the Court.

Mr. SYLVANUS WILCOX, for the appellant.

Messrs. GOOKINS & ROBERTS and Mr. VAN H. HIGGINS, for the appellees.

Mr. JUSTICE LAWRENCE delivered the opinion of the Court:

David L. W. Jones died in 1834, intestate, and seized in fee of seventy-seven acres of land near Chicago.   He left a widow, Frances, who afterwards intermarried with Seth Paine, and a daughter, Margaret, two years of age, who afterwards became the wife of Timothy R. Young, appellees herein.   One Whitlock was appointed, in 1835, administrator of the estate of Jones.    During his administration the Legislature, in December, 1836, passed a special act authorizing the administrator to sell the real estate of the deceased and apply the proceeds to the liquidation of his debts, and invest the residue in productive real property, or public securities, for the benefit of the widow and child.   In April, 1837, Paine was appointed administrator in place of Whitlock, and in July, 1837, acting as administrator, he sold, at private sale, the land above mentioned to Harrison Newhall, at ten dollars per acre, payable $200 in cash, and the residue in three annual installments. The purchase was made in Newhall's name, but for the joint benefit of himself and Davidson, the appellant.   The avowed object of the sale was to raise money for the education of the daughter Margaret, and this was known to Newhall at the time of his purchase.   The purchase money was received by the administrator, and, in return therefor, he sent Margaret to a Seminary at a cost of between two and three hundred dollars, and conveyed to her, while she was yet a minor, forty acres of land near Lake Zurich, in Cook County, and estimated to be worth $10 per acre.   In January, 1852, Margaret, then about twenty years old, became the wife of the appellee, Young, and in October, 1853, they commenced an action of ejectment for the recovery of the land in controversy, first offering to repay Newhall the amount of his expenditures, in purchasing and improving the same.   This action of ejectment was taken to

the Supreme Court, and heard here at the June term, 1855. *Davenport* v. *Young*, 16 Ill. 549. It was there held that the administrator had no power to sell, by virtue of this act, except for the purpose of paying debts; that before he could sell, such debts must be judicially shown to exist, and duly allowed against the estate; that no debts having been allowed, the power to sell under the act did not arise, and the sale and deed were void.

The legal title having thus been settled, Davidson, to whom Newhall had quit-claimed one-half of the land when the latter procured his deed from Paine, in 1851, filed this bill in chancery, asking a decree to restrain Young and his wife from setting up their legal title to said land, or from claiming the right of possession therein. The Circuit Court, after hearing the case on the pleadings and evidence, dismissed the bill, and the complainant has brought the record to this court.

The case is based upon the theory that, although the sale by the administrator was void, yet Margaret Jones, now Margaret Young, by her acts at the time of the sale, while she was yet a minor, and also by her acts after she attained her majority, is equitably estopped from claiming title to the premises. We will consider the alleged grounds of estoppel in their order.

The record shows that Margaret was about fifteen years of age at the time of the sale to Newhall; that she was desirous of being educated; that with her consent, and that of her mother, the land was offered for sale by Paine; that Newhall, before purchasing, consulted both the mother and daughter as to their wishes; that they consented to the sale; and that the land was sold for what was then considered a fair price, and the proceeds were partly applied towards her education, and partly invested in another tract of wild land, in her name, but at the sole direction of the administrator. These are all the circumstances immediately connected with the sale, from which the estoppel is alleged to arise.

Undoubtedly an infant is responsible in damages for his

torts and his frauds.  If he were to falsely allege himself to be of age, for the purpose of inducing another person to purchase and take a deed of his lands, he would be liable to respond in damages for any injury which might result to the purchaser in consequence of the deceit.  Whether he would be estopped, in a court of chancery, from disaffirming such a conveyance on his arriving at majority, is a question which, upon the authorities, is by no means clear.  There seems, however, to be only a technical reason why the doctrine of equitable estoppel should not, in such cases, be applied, and in a case of that character, we should be strongly inclined to hold the infant bound.  But in the case at bar, the infant made no false statement to the purchaser, and perpetrated no fraud.  She simply *consented* to the sale of the land by the administrator.  Now, if an infant is not bound by the solemn and deliberate consent manifested by her own conveyance of her land, we do not know by what process of reasoning it can be made to appear that she is bound by her parol consent that another shall make the conveyance.  The rights acquired by Newhall, under a sale made by the administrator with the consent of Margaret, were certainly not greater than if she had made the sale herself, and at the same time given her own deed for the land.  Yet such a sale and conveyance, unaccompanied by false representations, would have given Newhall no legal or equitable title which Margaret would not be at liberty to disaffirm.  So far as the alleged equitable estoppel is based upon the consent given to the sale, the position of the appellant is clearly untenable.

Did any thing occur after Margaret attained her majority, which amounted to a ratification, or can be considered as an equitable estoppel?  The circumstance which seems to us to merit, and to which we have given the most consideration, is this:  The deed from the administrator to Newhall, was not made until August, 1851, though the last payment had been made in June, 1850.  Margaret was then of age.  The deed was handed by Newhall to the administrator just before leav-

ing Chicago, and was executed by him at a hotel in Elgin. He sent for a justice of the peace to come to the hotel to take the acknowledgment. He had his family with him, including Margaret, several younger children, his wife, and an aunt of Margaret. The party were occupying a sitting room and an adjoining bed room. When the justice came, Paine, the administrator, explained to him fully the character of the deed. The justice testifies that while he was there, some persons came into the sitting room from the bed room, to whom he was introduced, and he thinks they were young ladies. The witness, Rosenkranz, entered the room while the justice was there. He says Margaret, her mother, and aunt, were either in the sitting room or in the bed room, with the door open, and they came into the sitting room after his arrival. He says " I did not, to my recollection, see any acknowledgment taken of a deed." The aunt, Miss Whitlock, testifies that she neither saw nor heard of the acknowledgment of a deed. Her entire testimony, however, gives the impression that she testified under a strong bias.

This is, substantially, all the evidence in the record from which we are asked to find that Margaret knew and consented to the making of this deed, and to make such finding the basis of a decree divesting her title to valuable property. Is this evidence sufficiently clear to justify us in so doing? Can any thing more be said of it than that it is possible she knew of the acknowledgment, and the delivery of the deed to the justice for the benefit of Newhall, but that it is not proven in such mode as, in itself, to justify the judicial divestiture of important rights? And the complainant claims title under this ratification, and must therefore prove it with reasonable certainty. Here, in a couple of rooms at a hotel, are Paine and his wife, Margaret and Miss Whitlock, several children, the justice of the peace, and Rosenkranz, who seems to have been visiting the ladies, and who swears that he was conversing with them while there; that he remained until after the justice left, and that when he arrived, the ladies were in a bed room

with the door open. Under these circumstances whether Margaret did or did not know that a deed was being acknowledged and delivered, for the purpose of conveying her land, is at most a matter of conjecture. It can not be asserted, with any confidence, as a fact.

In this lame condition of the proof, what is the law upon which the complainant must rely? He claims an equitable estoppel. "The doctrine of estoppels *in pais*, or equitable estoppels" is based upon a fraudulent purpose and a fraudulent result. If, therefore, the element of fraud is wanting, there is no estoppel; as, if both parties were equally cognizant of the facts, and the declaration or silence of the one party produced no change in the conduct of the other, he acting soelly upon his own judgment. There must be deception and change of conduct in consequence, in order to estop a party from showing the truth." 2 Story's Eq. Jur. § 1543, 8th ed. The principles here laid down are fully sustained by the adjudged cases. *Sellen* v. *Groe*, 41 N. H. 465; *Train* v. *Kiefer*, 13 Ala. 136; *Dixfield* v. *Newton*, 41 Maine 221; *Taylor* v. *Ely*, 25 Conn. 250; *Hill* v. *Epley*, 31 Penn. St. R. 331.

Now, conceding that Margaret knew that this deed was being acknowledged and delivered, and that she kept silent, would this fall within the foregoing principles of equitable estoppel? "There must be deception and change of conduct in order to estop a party from showing the truth." What deception was there here on the one side, or what change of conduct on the other? By getting his deed Newhall placed himself in no worse position. Nay, in one respect his position may be considered as better, since he acquired, in his deed, the evidence of whatever rights he had obtained by his purchase. The purchase money had long been paid, and the improvements all made upon the land. All the material parts of the transaction had been consummated. The deed was merely the evidence of what had already occurred. The equities of Newhall, whatever they were, had accrued prior to this transaction. If he had any, a court of chancery would aid him, whether he

obtained the deed or not. Then as to the deception. In what did it consist? The deed was acknowledged in Elgin. Newhall was in Chicago. Whether Margaret spoke or remained silent, he was not in a position to be influenced thereby. It would be idle to say that either the administrator executed, or the magistrate took away the deed, in consequence of any influence then and there exercised by the silence of Margaret upon Newhall. Besides, in what mode could the deception be practiced? The evidence shows that when Newhall bought the land he was cognizant of all the facts. He knew the position of the title, and under what authority the administrator was selling, and for what purpose. He had taken legal advice as to the validity of the proceedings. He committed an error of judgment, but he can not be said to have been deceived as to any matter of fact. He was a familiar friend of the family, and although no fraudulent intent is chargeable upon any one in this transaction, yet it is vastly more probable that Margaret was influenced by her step-father and family-friend, than they by her. For these reasons, without adverting to any other, we are of opinion that there was no equitable estoppel in the circumstances which surrounded the making of this deed.

Then did they amount to a technical ratification? We would willingly grant the relief asked in this case, if it could be done on any legal grounds, and although the question of ratification, as distinct from estoppel, has not been much urged, yet we have considered the case in that aspect. If an infant, after attaining his majority, re-delivers his deed, made in infancy, it would be a ratification. But this case is not within that principle. In order to constitute a ratification of acts done in infancy, the act relied upon as a ratification, must be performed with a full knowledge of its consequences, and with an express intent to ratify what is known to be voidable. See *Tucker* v. *Morland,* 10 Pet. 58; *Hoyle* v. *Stow,* 2 Dev. and Batt. Law. Rep. 320; *Boody* v. *McKenney,* 23 Maine 523; *Doe* v. *Abernethy,* 7 Blackf. 442; *Jackson* v. *Carpenter,* 11 Johns. 539; *Jackson* v. *Burchin,* 14 Johns. 124.

11—38th Ill.

Admitting that Margaret knew of the acknowledgment of the deed at the Elgin Hotel, we have no reason for saying that she intended to ratify it. Her attention was not called to the transaction, nor was any thing said to her which would make it necessary to assert her claims. And unless her attention was thus challenged, so as to call upon her for reply, nothing is to be inferred against her, in the way of intended ratification, from her silence. The room was evidently in some confusion. There were six adults present besides the children. Persons were passing between the bed room and the sitting room. The witness Rosencranz was paying a visit. The magistrate and the administrator were talking about the deed, and although Margaret may have known that the latter was acknowledging and delivering a deed for property once belonging to her, and long since sold, yet, giving the evidence the strongest construction in favor of the appellant, it can not still be claimed that she was in any way participating in the transaction, nor can it be supposed that she thought it necessary to interfere, in order to save her rights from peril. Ratification must be deliberate, intentional, and unequivocal, and no case can be found where it has been inferred from mere silence under such circumstances as these.

The record shows that Newhall, after his purchase, planted trees upon the land, inclosed about ten acres, and erected a small house, the total value of the improvements being from $1200 to $1500. The house was removed by him after the decision of the ejectment. It is urged that Margaret is estopped by standing by, in silence, while these improvements were being made. But she attained her majority in May, 1850, and these improvements were made prior to that date. The witness Childs, resided on the land from September, 1849, to February, 1851, and the only rent he was to pay, was to keep these improvements, which were made when he went there, in good order. What we have already said in regard to the consent to the sale given by Margaret during her infancy, will apply here. The improvements were made by Newhall with a full

knowledge of his title, and without misrepresentation or fraud on the part of Margaret, and their being made under such circumstances does not conclude her rights, on coming of age. Besides we find no evidence in the record that Margaret had actual knowledge of these improvements until after they were made.

The estoppel is also urged upon another ground. We have already said that for $300 of the money received by the administrator for the land, he conveyed to Margaret, without her then knowledge, forty acres of land on Lake Zurich. Both before and after she became of age, Margaret frequently spoke of this land as belonging to her, and on one occasion, when the witness Wilson was telling her and her mother that he had rented Paine's farm, she proposed to him to take her land on the same terms. Casual conversations of this character with strangers having no interest in the land or in the transactions connected with it are no estoppel. They in no way influenced the conduct of Newhall. Only those occurring after she become of age would be important, and before those took place he had bought and paid for the land and made his improvements. It does not appear that he had any knowledge of such remarks, nor is it pretended that he changed his conduct or position in consequence of them.

But it is said that Margaret and her husband conveyed the Lake Zurich land, and thereby ratified the original transaction. If Margaret and her husband had conveyed the land for their own benefit, or in their own right claiming title thereto, or if Margaret had, in any mode, after she became of age, knowingly appropriated to her own use any of the proceeds of the sale of her own land, that circumstance would give the case a different complexion. But no such facts exist. It is true that Margaret and her husband conveyed the Lake Zurich land, but without claiming any beneficial interest in it or receiving any portion of the proceeds. Mrs. Young commenced her actions of ejectment for the recovery of the land in controversy by service of the declarations in March, 1853, and filing them

in January, 1854. The cause was tried during that year in the Circuit Court, and in June, 1855, decided in this court. It was not until July, 1856, that Young and his wife conveyed the Lake Zurich land, and it would be folly to suppose that, under these circumstances, the conveyance was intended by them to be in their own right. But the legal title to the Lake Zurich land stood in Margaret on the records, by the deed which Paine caused to be recorded during her minority. Besides, in 1853, Paine executed a deed of trust to Young, of all his property, real and personal, in trust for Mrs. Paine. Mrs. Paine sold the Lake Zurich land and received the money therefor, and upon her order Young and his wife, Margaret, made the conveyance to the purchaser. This was their only connection with the matter. Repudiating, as they did, the sale by Paine to Newhall of Margaret's land, they necessarily held the Lake Zurich land subject to Paine's order, and when he transferred it for the benefit of Mrs. Paine they had only to act according to her directions. They could not tender a deed of it to Newhall, or hold it for him, as he had not, at any time, the slightest connection with the land. The title came to Margaret from Paine, and, in repudiating the Newhall purchase, she had no other duty, in regard to this land, than to do with the title whatever Paine or his grantee might direct.

The counsel for the appellant speaks of the fact that $87 of the purchase money, part of the last payment, was paid by Newhall to Paine in June, 1850, and that Margaret had become of age the previous month. There is, however, no evidence that Margaret knew of such payment, nor any pretence that she received any portion of the money. The only mode in which she ever derived any benefit from the money paid by Newhall was in the expenditure of a part of it in her education during her minority. Only about one hundred dollars were expended directly in that way, the Seminary expenses being in great part paid by being credited on a debt due from the Seminary to Paine, and to the extent of such credits, Paine

appropriating the proceeds of the sale of the land.  We have sufficiently commented on all such facts, in this case, as are at all material.

Two cases are especially relied on by the counsel for appellant.  One is *Storrs* v. *Barker*, 6 Johns. Ch. 167.  There Barker, ignorant of his own title in consequence of misapprehending the effect of a certain will, advised and encouraged the sale of a tract of land by Foster, the supposed owner, to Storrs.  The latter occupied and built upon it, and finally sold it to Burks. Barker then discovered that he was the owner and for the first time asserted his title.  The case is a strong one, but it differs from the one at bar in this most material particular, that Barker was of age and Margaret was an infant.  In the case of infants, simple silence or consent will not estop.  With adults it may.

The other case is *Penn* v. *Heisey*, 19 Ill. 295.  Between that case and the one at bar there is an external resemblance, but the principles upon which they rest are radically different.  In that case a guardian had sold land for a fair price, under an order of court regularly made.  The only objection to the sale was, that the guardian failed to report it to the court and procure an order of confirmation.  The proceeds of the sale had been expended, partly in the nurture and education of the ward, and partly in the purchase of other real estate.  After the ward was married she and her husband closely scrutinized the guardian's account, and made no objection thereto, but on the contrary sold, for a large price, the land bought by the guardian for her, and received the proceeds of the sale.  It was this circumstance which, in the opinion of the court, estopped them from denying the validity of the guardian's sale.  With their eyes open, and the ward being then of full age, she and her husband ratified the guardian's sale by appropriating its proceeds.  The court, in its opinion, says:  " Her act of selling those lands, as it is in proof she has done, is an affirmation that her title to the lot had passed to the purchaser at the sale, and she ought not, now, to be allowed to make a contrary allegation, to the injury of a *bona fide* purchaser for a

full price, under a title which had been acquiesced in, by all parties, for near twenty years."

We have already said that in the case before us, if Margaret had knowingly received the proceeds of the sale, or any part thereof, after she became of age, the decision of the court might be very different.

There are also other features in which the case at bar differs widely from *Penn* v. *Heisey.* There the purchaser at the guardian's sale had a clear equitable title. The court ordering the sale had jurisdiction. A proper case had been made for its exercise. The sale was regularly held, and the land sold for a fair consideration. The purchaser had paid his money. That gave him, under these circumstances, the equitable title. Nothing remained for him to do. In order to turn his equity into the legal estate, it only remained for the guardian to report the sale. This he had a right to expect the guardian would do, and the order of the court would have followed. In a case of this kind the order would have been a matter of form. It was, however, technically necessary to the legal investiture of the title, but it was an act that might have been performed at any time during the life of the guardian.

But while, in that case, the purchaser had every equity, what has he here? Simply what arises from the payment of his money to a person who had no right to receive it. No doubt he paid it in good faith, but as he must be presumed to know the law, we must presume him to have known that Paine had no power to sell the infant's land. The case contemplated by the act of the Legislature had not arisen. There was no power to make this sale, either under that law, or any order of court, while in *Penn* v. *Heisey*, the guardian had full power to sell. In this case Paine was professedly selling the land of the infant for her education, and yet he was not her guardian, and had nothing to do with her education or her property. She had another guardian in Kentucky where she also had property. Newhall, however innocent his intentions were in fact, must be held legally chargeable with all these things, and considered

as knowing that his first steps in the purchase of this property, were a violation of the rights of Margaret, to which even her express assent, as a minor, gave no validity.

In this case, as in many others, there is a certain appearance of hardship, but that does not justify the court in departing from established rules of law. Courts can not be vested with discretion to determine, as each case arises, at what age a person has sufficient intelligence to contract. For the sake of certainty a general rule must be established with a view to protect the young against the crafty and unprincipled. That rule must fix an age for all persons within which their contracts shall not bind their property. If others seek to acquire a title to their property while within that age, they must act with the full knowledge that their contract has no binding force—that they place themselves substantially at the mercy of the infant, and that the law can not aid them merely because in the particular case, the infant may have had so much intelligence when the contract was made, as to render it morally wrong in him to repudiate it on arriving at majority.

*Decree affirmed.*