Sumner *v.* Seaton.

# Marion W. Sumner

*v.*

# George Seaton.

1. Where one person looks on and sees that another is acting upon a mistaken supposition as to his rights as against the on-looker, and in such manner that he will be seriously injured by the assertion of those rights by the on-looker, and does not warn the party so acting of his mistake, the on-looker will be estopped from asserting his rights against the other, except upon terms of indemnifying him.

2. In order to raise an estoppel in such case, it is necessary that the party to be estopped should, in general, be aware of his own rights, and should perceive that the other party is acting upon a mistaken notion of his rights.

3. The mere fact that a party who is acting in good faith upon a mistaken notion as to his title to land might have discovered the true situation of the title by examining the records, will not prevent him from setting up an estoppel against the true owner, who stands by in silence with knowledge of his mistake.

4. Improvements and expenditures upon the land itself is not the only use which may be made of it under a mistaken notion of title which will estop the true owner. Improvements put on other lands in such manner that the use of the land in question is necessary for their enjoyment, is sufficient.

5. Complainant's grantor and defendant owned lands in severalty which met in the centre of a street. Afterwards the municipal authorities changed the lines of the street in such manner that a narrow strip of defendant's land, formerly in the street, was left on the opposite side and was fenced in by complainant's grantor. Afterwards the land including the strip was conveyed to complainant, who, honestly supposing that she owned up to the street, erected a valuable dwelling on her lot, the defendant standing by and making no claim to the land and giving complainant no notice of his demand.—*Held*, he was estopped from claiming possession of the strip.

Bill for injunction.     On final hearing on pleadings and proofs.

The bill prays for a perpetual injunction against the defendant to restrain him from further prosecuting an action of ejectment brought by him in a court of law against the complainant, in which a finding against complainant had been made by the judge sitting without a jury. After the filing of the bill judgment

final was entered on the judge's finding, and the cause proceeded on that basis.

The dispute is over a small strip of land adjoining the street and immediately in front of complainant's dwelling, on the south side of Rahway avenue, in the city of Elizabeth.

The facts are as follows: Prior to 1865 Rahway avenue, for a distance of about seventeen hundred feet, including the frontage of the premises in question, was more or less serpentine in its course. In 1865 the municipal authorities passed an ordinance straightening the avenue for the space and distance above mentioned, giving courses and distances of the new side lines, and ordaining that "all of said avenue as now existing outside of said above description to be vacated, and that the land and real estate necessary for such purpose to be taken and appropriated," and that "the whole amount of costs, damages and expenses incurred in the prosecution and completion of said improvement shall be duly assessed according to the provisions of the act" &c. of March 4th, 1863.

The lines of the street as altered were shown by a map made by the municipal authorities and filed in the proper department, and by that, and the evidence in the cause, it appears that complainant's grantor, Mrs. Elizabeth P. Smith, was the owner of a lot situate on the south side of Rahway avenue, extending from Bay Way, an intersecting street, easterly about five hundred feet to Coursen's land. Opposite this frontage the lines of the street were moved to the northward so far that the southerly line of the new street was, for the whole stretch of five hundred feet, north of the centre line of the old street. The effect of this change—upon the assumption that the titles of the adjoining owners met at the centre line of the street—was to cut off from the properties on the north side a strip of land formerly in the street and leave it on the south side immediately in front of Mrs. Smith's land, and—supposing that the legal and equitable title of this strip still remained in the north-side owners—to cut her lot off from all access to the street. This strip was in shape the segment of a circle whose radius was about eight hundred feet,

and had a width of about six feet at each end and about thirty feet in the middle.

The land opposite Mrs. Smith was owned, as to about three hundred and seventy feet next to Bay Way, by one Wetmore, and as to the remainder, by the defendant. That part of defendant's land left south of the southerly line of the new street, in front of Mrs. Smith's land, is the land here in dispute, and is about one hundred and fifteen feet in length by six feet wide at the easterly end, and fifteen feet wide at the westerly end. But on the official map the whole strip is marked as belonging to Wetmore.

A commission appears to have been appointed by the city council under the ninety-fifth and ninety-sixth sections of the charter of Elizabeth (*P. L. of 1863 p. 146*), " to make an assessment of the damages which the owner or owners of land and real estate taken and appropriated for the purpose of the improvement would sustain by taking and appropriating the same," which made a report November 12th, 1866, by which they awarded to D. D. Buchanan, for his land taken, $90 ; to W. S. Wetmore, for his land taken, $666, finding, in each of their cases, that their benefits to be derived from the improvement were greater than their damages, and awarding to George Seaton, the defendant; for the value of his land taken, $261, and for damages to him $780, in all $1,041 ; but how, or to what land, such damage was done, does not appear. Afterwards the council seem to have ascertained the total cost of the improvement at $2,324.67, and the same commission, under the one hundred and first and subsequent sections of the charter, proceeded to make an assessment of the costs of the improvement on the lands benefited, and made a second report in March, 1867, by which they estimated the benefits to Mrs. Smith's lot, by the name of " Isaac T. Smith," her husband, at $500, and assessed against it $496.43 as her share of the costs. This report deals with all the properties on the line of the improvement, eleven in number, in the same manner, except the defendant's, as to which it is silent and makes no assessment against him. It appears, however, that the damages awarded to him, for the land taken from him, by the

first report were paid to him, and he executed a release under
seal in these words :

"Know all men by these presents, That I, George Seaton, do hereby
acknowledge the receipt of        to me paid by the City of Elizabeth, for my
damages sustained and awarded to me on account of the taking and appropri-
ating land and real estate for straightening Rahway Ave.

"Damages .......................................................................... $1,041 00
"Interest from Dec. 6, 1866................................................... 618 30
                                                                        ———————
                                                "$1,659 30

"And in consideration thereof, I do hereby release, acquit and discharge the
said 'The City of Elizabeth' from all further or other damages sustained on
that account; and I do appropriate the land and real estate so taken for the
purposes aforesaid, and suffer and permit said 'The City of Elizabeth' to
take, use and occupy the same therefor.

"In witness whereof I have hereunto set my hand and seal this tenth day
of July, A. D. eighteen hundred and seventy-five.

                                "GEORGE SEATON.   [L. S.]

"Signed, sealed and delivered in the presence of
                                        "D. W. LEED.'

In due time after the filing of the assessment a protest was
filed against it by the husband of Mrs. Smith, in these words :

"To the Honorable the Mayor and City Council of the City of Elizabeth :

"The undersigned respectfully protests against the present estimate of benefit
and damage as reported by the 'Commissioners of Assessment for Straighten-
ing Rahway Ave.,' because the damage to his property far exceeds the benefit,
and he is left with no front on Rahway Avenue, as W. S. Wetmore owns a
strip of land between his property and Rahway Avenue, as appears by the
map. Therefore he is not at all benefited by this opening of the avenue, as
it leaves him with no property therein.

"In any case the amount he must expend in grading this land given to him
and in purchasing the piece of land now owned by W. S. Wetmore, lying
between his land and Rahway Avenue, should be considered as an element of
his damage.

                                "ISAAC T. SMITH."

Notwithstanding this protest the assessment was confirmed
June, 1867.

The protest above set forth was prepared and filed by Mrs.
Smith's son, without consultation with her, and he swears that,
upon further consideration, he concluded that the effect of the

Sumner *v.* Seaton.

whole proceeding would be to vest in his mother the equitable title in the strip cut off from the north-side owners, and he abandoned further opposition to the assessment, and the amount assessed against his mother was paid by her.

A few years after this proceeding—just how many does not clearly appear—a new fence was built by Mrs. Smith along the south side of the new street in front of her land, by which the strip cut off from the north-side owners was enclosed as a part of her lot. In 1873, and some time after this enclosure, Mrs. Smith and her husband made a conveyance of the easterly part of her lot, with a frontage of one hundred and fifty feet, to her daughter, the complainant, then recently married, and the husband of the latter immediately, and the same year, commenced to make improvements on it.

Complainant and her husband both swear that at no time prior to the fall of 1888 did either of them have any suspicion that any other person did or could claim any right or interest in any part of the premises so conveyed to the complainant, and that the improvements which they afterwards made were all made in the complete confidence and belief that the title of complainant to every part of her lot was perfect.

The strip here in dispute had formed part of the old street, and there was nothing on the ground to distinguish it from that part of the old street which lay south of its centre line.

The improvements consisted of the erection of a costly dwelling, about one hundred feet from the street, grading and sodding the grounds, including the strip in question, building a new and expensive fence along the line of the street, planting shade-trees and shrubbery on the strip itself. These improvements were made between the fall of 1873 and the fall of 1877. Complainant continued in the uninterrupted possession of her lot without any notice or demand from the defendant until the fall of 1888, when he made known his claim and commenced the ejectment suit. During the whole period he lived immediately opposite, and saw and observed all that was done by the complainant and her husband in the way of making the improvements above mentioned.

*Mr. George Putnam Smith* and *Mr. F. G. Burnham,* for the
complainant.

*Mr. Frank Bergen,* for the defendant.

PITNEY, V. C.

Complainant rested her right to relief on three grounds—*first,*
that the effect of the proceedings to change the location of the
street was to vest in her the absolute legal title to the strip in
question; *second,* that if the effect was not to change the title at
law it did in equity, and, *third,* that the defendant is estopped by
his silence and acquiescence, while complainant was making her
improvements, from setting up his title as against her.

As to the first point. Should the complainant satisfy the court
that it is well taken, the result would be simply to oust the juris-
diction of the court, for the simple reason that the ground is
available at law as a defence to an action of ejectment. The
proceeding here is, and must be, on the basis that the legal title
is in the defendant; and as there has been a general verdict ren-
dered by a judge without a jury in favor of the defendant herein
and judgment entered thereon, it must have been upon a finding
that the legal title is in him.

The second point presents a more serious question.

Mrs. Smith owned a lot with five hundred feet of frontage on
a street in the city of Elizabeth. As so situated it was admitted
that it had great value. The city council changed the location
of the street in front of it in such a manner as to cut off access
from this lot to the street, by interposing in front of it land be-
longing to a third party. That such a change must result in a
serious injury to the value of the lot is obvious. Yet not only
were no damages awarded to Mrs. Smith, but a commission
actually assessed a large sum against her for benefits conferred
upon her lot, and when the feature in question was called to the
attention of the municipal authorities they refused to abate it.

Complainant urges, and I think rightly, that the action of the
commission and the common council can be accounted for, con-
sistently with the least intention on their part to act fairly and

justly towards Mrs. Smith, only on the ground that they supposed that the effect of the proceeding was to vest in her the beneficial use of the intervening strip. It is impossible to suppose that five gentlemen, chosen on account of their intelligence, good judgment and honesty, would make such an award on any other basis, or that an impartial city council would confirm it. These officials cannot be supposed to have been ignorant of the true situation of the property lines, for, not only was their attention called to it by the written protest of Mr. Smith, but the map shows it most clearly. For these reasons, I think it must be assumed that the whole proceedings, as well the ascertainment of damages as the assessment on account of benefits, must have proceeded on the basis or assumption that the strip in question would become the property of Mrs. Smith. The effect of this assumption is obvious. The sum total or aggregate of the cost of the improvement was reduced by the amount which the city would have been obliged to pay, if anything, to Mrs. Smith for damages to her lot, caused by cutting it off from the street, and the amount to be assessed against the other lots, not situated in this respect the same as hers, was reduced by the amount actually assessed against her lot and paid by her. Presumably, then, every other person liable to assessment derived a direct pecuniary benefit from the assumption in question. And there is, to my mind, great force in the argument, that all the landowners who participated in the fruits of this assumption became parties, so to speak, to the arrangement, and are estopped from setting up the contrary of the assumption upon which it was based, and from which they received a direct benefit.

But the defendant was not mentioned in the assessment on account of benefits, and it was not proved that he had anything to do with it, or that he made any individual arrangement with the common council on the assumption before mentioned. It is not shown that he knew anything of it or of the commissioners' last assessment. And I do not at this moment perceive how the court can presume anything against him in this respect.

But counsel for the complainant relies in this connection upon the release executed by the defendant, as above set forth. He

argues that it must be read and construed in the light of the actual facts and features of the scheme of improvement, one of which, by the maps and assessments, appeared to be, that whatever land the north-side owners might own south of the south line of the new street should go to the owners on that side, and that such feature clearly appeared by the inspection of the map on file in the proper department of the municipal government; and he argues that the land so, in effect, attempted to be transferred from the defendant to the complainant's grantor is fairly included in and covered by the language of the release as "land and real estate taken and appropriated by the city for the straightening of Rahway avenue."

In this connection, it is important to observe that the payment was made to defendant and the release in question executed by him in July, 1875, long after the strip in question had been fenced in and enclosed by complainant's grantor and her improvements in part made, so that defendant, when he executed the release and accepted the money, must have known by observation, just what the effect of the improvement was, and that the complainant supposed that she owned this land and was acting on that supposition.

The power of a municipal corporation, in the absence of objection, to acquire land and transfer it to a natural person as a part of a scheme of legitimate improvement, is sustained by judicial decision. *Embury* v. *Conner, 3 Comst. 511; Sherman* v. *McKeon, 38 N. Y. 266.*

But I have not found it necessary to determine definitely whether upon the second ground alone complainant is entitled to succeed in this court. This part of the case, however, has, in my judgment, an important bearing on complainant's third position, since I think the circumstances referred to fully justified Mrs. Smith and her daughter, the complainant, in supposing and believing that the effect of the improvement was to give her the beneficial title to the strip in question, and that she and her assignee, the complainant, acted in good faith on that assumption.

In answer to this inference, defendant contended that the protest of Mrs. Smith's husband, above set forth, shows that she had

notice of the fact that defendant had the legal title to the land
·in dispute.    But on that point it is to be observed—*first*, that the
land here in dispute was marked on the map as belonging to
Wetmore, who was a party, so to speak, to the assessment and
·bound thereby ; *second*, that Mrs. Smith's son, who prepared the
·protest, swears that his mother knew nothing of it ; *third*, that
he concluded, upon consideration, that the effect of the proceed-
ing was to vest the beneficial title in the strip in his mother, and
so paid the assessment without further question ; *fourth*, that the
complainant is not chargeable with knowledge of the protest, and
she and her husband deny all notice of any defect of title.

This brings us to complainant's third ground, namely, estoppel
·by acquiescence and silence.

Here complainant relies upon the familiar maxim, that where
·a man has been silent when in conscience he ought to have
spoken, he shall be debarred from speaking when conscience·
requires him to be silent.    Or, as it is otherwise expressed, *"Qui
·tacet, consentire videtur; qui potest et debet vetare, jubet si non
vetat."*

In *Wendell* v. *Van Rensselaer, 1 Johns. Ch. 344,* Chancellor
Kent (at *p. 354*) says : " There is no principle better established
in this court, nor one founded on more solid foundations of equity
and public utility, than that which declares, that if one man,
knowingly, though he does it passively, by looking on, suffers
·another to purchase or expend money on land, under an erroneous
·opinion of title, without making known his claim, he shall not
afterwards be permitted to exercise his legal right against such
person.    It would be an act of fraud and injustice, and his con-
·science is bound by this equitable estoppel."

This doctrine was approved by Chancellor Pennington in *Ross*
v. *Railroad, 1 Gr. Ch. 422* (at *p. 434*) ; by the court of appeals
in *Doughty* v. *Doughty, 3 Halst. Ch. 643* (at *p. 650*), and has
·since been recognized in many cases in this court, and was acted
upon by Chief-Justice Beasley, sitting for the chancellor, in *Erie
Ry. Co.* v. *Del., Lack. and Western R. R., 6 C. E. Gr. 283* (at
*p. 288 et seq.*), and by Vice-Chancellor Bird in *Swayze* v. *Carter,
14 Stew. Eq. 231.*

The only question that has ever been raised as to the value of the maxim is, that its application to particular cases is sometimes difficult and embarrassing, and requires great care and discrimination. See *Philhower* v. *Todd, 3 Stock. 312* (at *p. 315*). But this may be said of all the fundamental maxims and principles of equity, and must not deter the equity judge from applying them, where properly applicable.

Several canons have been suggested by the judges as guides in this work, but in construing them we must not lose sight of the facts in the particular case in which they have been enunciated, and must interpret them accordingly.

Lord Cranworth, in the house of lords, in *Ramsden* v. *Dyson, L. R.* (*1 Eng. & Ir. App.*) *129* (at *p. 141*), after stating the principle with great clearness, says, that in order that the maxim shall be applicable to a case of this sort, viz., estoppel by expenditure of money on land, it must have three features—*first*, the person expending the money must honestly suppose himself to be the owner of the land ; and, *secondly*, the real owner, who encourages the expenditure by his silence, must know that the land belongs to him and not to the other, and, *thirdly*, that the other is acting on an erroneous belief as to its ownership.

This canon was applied by Chancellor Runyon in *Kirchner* v. *Miller, 12 Stew. Eq. 355.*

With regard to the first of these requisites, I have already shown that Mrs. Smith and her grantee, the complainant, were fully justified in supposing, and did actually suppose, that the land belonged to them.

But counsel for the defendant insisted that both Mrs. Smith and complainant are chargeable with notice of the record title of defendant, and argued that they had no right, in the face of it, to suppose that they had title. I cannot accede to this argument. In the first place, I do not understand that the strength of complainant's position depends at all upon her want of knowledge that defendant held the *legal* title to this land. If she be chargeable with full knowledge of all the record discloses in that respect, still the question remains, was not she and her mother justified in supposing that this strip, reclaimed, so to speak, by

Sumner *v.* Seaton.

the municipal action from an ancient highway, became, in some way, and as a result of those proceedings, her property?

But if the case were wanting in that element, still I do not think defendant's position tenable. Courts of equity have, in many cases, given parties the benefit of an honest supposition as to title where the slightest examination of the record or other equally available source of information would have disclosed their error. In fact, to exclude the application of the maxim from cases where the party has implied or constructive notice of title from the record, would confine its application to a very narrow field. Absence of notice, both actual and constructive, of the adverse title would, in many cases, give the party the benefit of the plea of *bona fide* purchaser without notice and dispense with the necessity of setting up estoppel *in pais.*

Chancellor Zabriskie, in *Dellett* v. *Kemble, 8 C. E. Gr. 58,* held a party entitled to equitable aid against a judgment creditor of his grantor, where the judgment creditor had stood by and, without notice, permitted the former to build on the property in the honest belief that it was free from encumbrance, when he could have discovered the judgment by a search.

In *Town* v. *Needham and Harvey, 3 Paige 545,* the title of Harvey, one of the defendants, to an undivided one-fourth of the premises at the death of his grandmother, clearly appeared by the will of the former owner, which was a part of complainant's chain of title, but he was granted relief against Harvey, on the ground that he bought and made improvements in the honest supposition that the other tenants in common, through whom he derived title, had in some way acquired and were the owners of the whole title.

So in *Brown* v. *Bowen, 30 N. Y. 519,* the title, which was barred by estoppel, was found on the public record.

In *Storrs* v. *Barker, 6 Johns. Ch. 166,* the plaintiff claimed under the devise of a married woman to her husband, and was chargeable with the knowledge that it was void; and it was held that he was justified in supposing that the title had been validated by some action between the devisee and the heir at law;

8

and the heir at law, having stood by and encouraged the purchase by plaintiff from the devisee, was held estopped.

In *Chapman* v. *Chapman and Gansamer, 59 Pa. St. 214,* where the plaintiff held under a long lease, and the defendants held in severalty parcels of the whole tract under subsequent conveyances from the same original owner, and plaintiff was held estopped from setting up his lease by his positive encouragement as to defendant Chapman, and by his mere silence as to defendant Gansamer, I infer that plaintiff's lease was a matter of record, since, if not recorded, defendants could have pleaded that they were *bona fide* purchasers for value without notice and need not have relied upon the estoppel.

The position that, in general, record notice of the title is sufficient to defeat the estoppel, where it rests on *mere silence,* receives qualified support from Professor Pomeroy in his treatise on *Equity* § *810;* and also from Mr. Bigelow in his last edition of his treatise on *Estoppel p. 594.* I have examined the cases cited by these authors in support of the text, and they are all distinguishable from the case in hand. They each lack one of its important features, viz., that the person sought to be estopped by his silence knew, or had reason to suppose, that the person asking the protection of the estoppel was acting in good faith on an erroneous supposition as to the title.

In *Fisher's Exr.* v. *Mossman, 11 Ohio St. 42,* the contest was between a mortgagee and a purchaser of the equity of redemption at sheriff's sale under execution against the owner of the equity. The mortgagee was present at the sheriff's sale and did not give notice of his mortgage, which was recorded, and it was held that he was not estopped by his silence in the absence of any notice or reason to suppose that the purchaser was ignorant of the existence of his mortgage.

In *Knouff* v. *Thompson, 16 Pa. St. (4 Harr.) 357,* it appeared affirmatively that the defendant knew of plaintiff's claim and that his own title was defective, and, moreover, the improvements made were of very slight value.

In *Hill* v. *Epley, 31 Pa. St. (7 Casey) 331,* the contest was between one tenant in common and the purchaser at sheriff's

Sumner *v.* Seaton.

sale of the interest of the other tenant in common under judgment and execution against him. The matter relied upon in estoppel by the purchaser at sheriff's sale was, that the grantor of the party now claiming against him had been present at the sheriff's sale and had failed to give notice of his title. When the case was first before the court, in *7 Watts 163*, the opinion and decision was favorable to the purchaser at sheriff's sale, and the remarks of the court and citation of authorities, found on *p. 168*, in support of the estoppel, are valuable. On a re-trial a verdict was rendered in accordance with this opinion in favor of the purchaser at sheriff's sale and against the owner of the outstanding half interest, and judgment thereon was reversed by the court in banc, in an opinion by Strong, J. On *p. 334* (*7 Casey*) he says: "It seems also to be well established that silence in some cases will estop a party against speaking afterwards. Thus, if one suffers another to purchase and expend money upon a tract of land, *and knows that that other has a mistaken opinion respecting the title to it,* and does not make known his claim, he shall not afterwards be permitted to set up a claim to that land against the purchaser. *His silence then becomes a fraud.* But silence without such knowledge works no estoppel. It is only when silence becomes a fraud that it postpones."

And again, *p. 335:* "Clearly, if David Witherow [the plaintiff's grantor and one of the tenants in common] had not attended the sheriff's sale, nothing would have been required of him after he had his deed upon record. This is conceded. But if it be admitted that his presence at the sale imposed upon him the duty of giving other notice than that which his recorded deed furnished, and which was consequently known to Epley, *it must be because he saw that the purchaser was still acting under an erroneous belief that the whole title was somehow in Samuel* [the other tenant in common and defendant in the execution]. Nothing else could make his silence work a fraud. But how could he see that? And how is such knowledge affirmatively brought home to him? There is no evidence of any such erroneous belief. The land was being sold as the land of Samuel With-

erow, it is true. But Samuel had an interest in the land. Neither the execution, nor the sheriff, nor the crier, asserted that that interest amounted to the entire fee simple, or to an estate in severalty. The sheriff had no right to define what the interest was. The writ was just such an one as it would have been if it had been known by every person present at the sale that Samuel Witherow owned but an undivided moiety. It is impossible, under such circumstances, to see how David's silence could be construed into an admission that Samuel owned the whole, because there was no assertion by the writ, by the sheriff, or by any one, that he did. *It is equally impossible to discover how David could have supposed that Epley was bidding under such an impression, for there was nothing to warrant it,* and a deed was on record showing the contrary, of the contents of which not only the law presumed, but he had a right to presume, every bidder knew. If the sheriff had offered for sale a tract of land belonging to David in severalty, in which Samuel had no interest, the consequences of silence might have been different."

I believe this to be a correct statement of the doctrine, and I conceive that it fully disposes of the attempt to avoid the effect of the silence in this case by an appeal to the record title.

The question is not so much what the party setting up the estoppel *might* or *ought* to have known or supposed, as what he *actually did know and suppose* to the knowledge of the other party.

The New York case (*Rubber Co.* v. *Rothery, 107 N. Y. 310*), much relied upon by defendant, is clearly distinguishable. It lacks the feature of the one party acting on the mistaken supposition that he owned the other party's land, and the other party knowing of the mistake. The case was this: Defendants owned both sides of a stream at a certain point. Further down they owned but one side, while the plaintiff owned the other side. Defendants built a dam across the stream above on their own land, and dug a raceway from it on their side of the stream, and built works which, when put in use, resulted in diverting the whole stream and carrying it down past the plaintiff's land before it was returned to its natural channel. Plaintiff saw these works.

·erected and made no objection. Defendants set their works in motion and diverted more than half the waters of the stream, and for that diversion plaintiff brought suit. Now, as defendants clearly had the right to divert one-half the water of the stream, and it did not appear that a beneficial use of the works could not be made with the one-half, or that plaintiff had notice of anything of the sort, it is clear that there was nothing in all that plaintiff saw defendants doing to lead plaintiff to suppose either that defendants supposed that they had a right to divert all the water, or that they intended to do so, or must necessarily do so in order to enjoy their works to their full extent; and, besides, it does not appear that the defendants supposed that they had a right to divert all the water, or that, as before remarked, the plaintiff knew or supposed that the defendants were acting on that supposition. The case is somewhat in line with *Cooper* v. *Carlisle, 2 C. E. Gr. 525, 535.*

In *Kirchner* v. *Miller, 12 Stew. Eq. 355,* the complainant made a mistake of a few inches in surveying the line between his land and the defendant's, for which mistake the defendant was not responsible, and of which he was not aware until after complainant had built. The defendant could not be guilty of any acqui-·escence unless he knew that the complainant was building over on his land, which he did not. The case lacks the features mentioned by Lord Cranworth. Moreover, the complainant was able to restore himself at a trifling expense, as shown by the opinion.

*Brant* v. *Coal Co., 93 U. S. 326,* is also clearly distinguish-·able. There a party, who held a life estate only, conveyed and took back a purchase-money mortgage which was assigned to the ·owner of the fee in remainder, who foreclosed. The deed of assignment recited the title truly. Defendant's grantor purchased ·at the foreclosure sale. Plaintiff was the owner of the remainder, and, at the death of the life tenant, brought suit in equity to restrain mining &c. Defendant set up estoppel, arising out of the foreclosure, and the court below dismissed the bill on that ground. This decree was reversed, on appeal, by a divided court.

Justice Field (at *p. 335*) says: "The purchaser was bound to take notice of the title. He was directed to its source by the

pleadings in the case. The doctrine of *caveat emptor* applies to all judicial sales of this character; the purchaser takes only the title which the mortgagor possessed. And here, as a matter of fact, he knew that he was obtaining only a life estate by his purchase. He so stated at the sale, and frequently afterwards. There is no evidence that either the complainant or Hector Sinclair ever made any representations to the defendant corporation to induce it to buy the property from the purchaser at the sale, or that they made any representations to any one respecting the title, inconsistent with the fact; but, on the contrary, it is abundantly established by the evidence in the record, that from the time they took from the widow the assignment of the bond and mortgage of the Union Potomac Company, in 1854, they always claimed to own seven-eighths of the reversion. The assignment itself recited that the widow had owned, and had sold to that company, a life interest in the property, and that they had acquired the interest of the heirs."

*Brewer* v. *Boston & W. R. R.*, *5 Metc. 478*, was an action of ejectment, where the party was precluded from setting up equitable estoppel.

In *Baldwin* v. *Richman*, *1 Stock. 394*, Baldwin claimed title by conveyance from Benjamin Richman, and was defeated in an action of ejectment by the heirs of Jeremiah, brother of Benjamin. Jeremiah being the sole owner of the fee of the land in question and other lands, but supposing that he owned them as tenant in common with his brother Benjamin, applied to the orphans court for and procured partition, in which the lot in controversy was set off to Benjamin, who entered, and, after the mistake was discovered, conveyed to Richman, who purchased with full notice of the true state of the title. The bill prayed relief against the ejectment. Chancellor Williamson dismissed it on two grounds: First (*p. 398*), that the bill "does not allege that Benjamin took possession of the land and improved it under the impression that the land was his own; nor is there any allegation that it was the conduct of Jeremiah that induced him to take possession and make improvements. From anything that appears in the bill to the contrary, he knew that Jeremiah

was acting under a mistake, and took advantage of it." Second (*p. 399*), that there was an allegation in the bill, but no admission or proof that Benjamin had made improvements or expended moneys on the land, hence no injury was shown.

The case is, in all its aspects, clearly distinguishable from the one in hand.

From the numerous modern cases in other jurisdictions in which the maxim has been applied, I cite the following, which seem to have been well considered: *Rochdale Canal Co.* v. *King, 16 Beav. 630, 22 L. J. (N. S.) Eq. 604; Slocumb* v. *C., B. & Q. R. R. Co., 57 Iowa 675* (at *p. 682*); *Ross* v. *Thompson, 78 Ind. 90, 96 ; Markham* v. *O'Connor, 52 Ga. 198; Chapman* v. *Pingree, 67 Me. 198; Stone* v. *Tyree, 30 W. Va. 687; Allen* v. *Shaw, 61 N. H. 95; Morgan* v. *R. R. Co., 96 U. S. 716.*

In the case in hand I find it impossible to suppose that defendant did not understand that the complainant was making her improvements in the complete confidence that she had title to the whole of her lot. It would have been an act of the greatest folly, if not outright insanity, in her to have made the improvements if she had supposed any other person owned the strip in question. The transaction spoke for itself; and, as before remarked, there was no pretence at the hearing that defendant did not so understand. He does, indeed, swear that he thought "these parties" were better prepared to know how much land he had there than he was. But the context shows that he referred merely to the quantity of his land cut off by the change of street lines, and not to the state of the minds of the "parties" alluded to as to their right to use and occupy it as their own. He did not swear that he did not suppose that Mrs. Sumner made her improvements in the honest belief that she had full right to the perpetual use and occupation of the strip in controversy.

With regard to the knowledge by the defendant that a part of the land in the old street to which he had the legal title lay to the south of the southerly line of the new street, I find no difficulty. An inspection of the map shows that he must have known it, and, besides, he not only does not deny it on the stand,

but distinctly admits it.   He swears that‎˙ he did not know *how much* he had.

In fact, defendant's counsel admitted in his brief that his client knew that he owned some land at the point in question, but did not know the quantity.

But defendant's counsel further insists, that no equitable estoppel arises in this case, because the dwelling erected by complainant was on her own land, and the actual improvements put on the land in dispute were so trifling in amount and cost as not to create a duty on his part to speak.

I cannot accede to the proposition necessarily assumed in this position, viz., that it is necessary that there should be an actual use or occupation of the very land in question by some fixed and permanent structure in order to raise an estoppel. The true ground of equitable estoppel I conceive to be, that the party, in reliance upon the existence of a certain state of facts, has so changed his position that he cannot be restored to his former position and will suffer serious loss if the facts prove to be different from what he supposed them to be; and the estoppel arises against the party who is responsible for his action on such mistaken belief, and it operates to prevent him from asserting the contrary.   Now, it is palpable that actual occupation by building on land is not the only use a party may make of it, the deprivation of which would result in serious injury to him.

For instance, suppose, in this case, complainant's lot had been but one hundred feet deep and twenty-five feet wide, and defendant's legal title had extended across the whole front and to a depth of ten feet, and complainant had built upon the whole lot, except the ten feet owned by defendant, leaving that as a front yard to his buildings.   It is at once apparent that the assertion of title by the defendant to the ten feet would have been utterly destructive of the value of complainant's structure.   Now, the difference between the case just supposed and the one in hand is one of degree merely.

Counsel, in this connection, further relies on the fact that the strip claimed by defendant does not reach across the whole front of complainant's lot, but leaves a space of about thirty feet next

to Mrs. Smith's line by which complainant can have access to the street.   But that space is covered by the Wetmore title, and it was admitted at the hearing that it had not been transferred to Mrs. Smith or to the complainant, unless such transfer resulted in equity from the proceedings before referred to.   So that if the Wetmore title is enforceable as well as defendant's, complainant is shut up to a mere right of way by necessity across her mother's lot.

But admitting that complainant has, after deducting the lot claimed by defendant, a frontage on the street of thirty feet, or one-fifth of the width of her lot, it is palpable that the utility as well as the market value of her property will be very injuriously affected if defendant may take exclusive possession of the piece in dispute; and it is equally clear, as before remarked, that defendant must have perceived and known that complainant was acting on the assumption that she owned this piece, and that she would not have built her house if she had not so supposed.

If ever there was a case in which the duty of the party to speak was clear, it seems to me it is this case, and that the language of Lord Cranworth, in *Ramsden* v. *Dyson,* *supra,* applies: "A court of equity considers that when the one party saw the mistake into which the other party had fallen, it was his duty to be active and state his adverse title, and that it would be dishonest for him to remain willfully passive on such an occasion in order afterwards to profit by the mistake which he might have prevented."

For these reasons, I think the complainant is entitled to relief, and it only remains to determine its nature and extent.

Courts of equity do not, in all cases of this sort, push the estoppel to the extent of passing the equitable title, but, in proper cases, permit the owner of the legal title to hold possession upon terms of compensating the party who has innocently made improvements upon the erroneous supposition; indemnity to the party entitled to the estoppel being, in all cases, the end aimed at.

It was not, however, suggested at the argument, or in the briefs of counsel, that remedy by compensation in money would be proper in this case.   And it is palpable that it would not.   The

value of the strip in question for use by itself must be quite insignificant, and the injury to complainant, by reason of its exclusive occupation by another, is not easily ascertained or measured in dollars and cents. The only mode in which complainant can be fully indemnified is to be protected in the perpetual enjoyment of the land in question, and for that purpose the defendant should be perpetually enjoined from asserting his legal title, and such will be the decree.