The bill of complaint in this case was filed to enforce the specific performance of an oral argument to convey real estate and for other relief.
Mr. Knox, the complainant, in the year 1932, was a patient of Dr. Floyd M. Kaelber, the defendant. Dr. Kaelber is an osteopath with offices in New York City. Mr. Knox stated that he was suffering from "the nervous strain of working in New York" and on the recommendation of a friend called on Dr. Kaelber. He had several treatments during the year 1932 and for three or four years thereafter received regular treatments, sometimes as frequently as two and three times a week, and at least once a month. Each treatment lasted from one-half an hour to an hour. The doctor suggested to Mr. Knox that his nervous condition would be benefited if he procured a residence in the country.
In October, 1935, Dr. Kaelber invited Mr. Knox to spend *Page 497 
a day with him at "Stag Hill," near Mahwah, New Jersey. Knox accepted the invitation and he, together with Dr. Kaelber and Dr. Waugh, another defendant and father-in-law of Dr. Kaelber, walked to the hill on a tract of land, containing about 231 acres, which Dr. Kaelber claimed to own. Here they partook of an outdoor luncheon. The doctor pointed out the beauty of the surroundings and the boundary lines of the tract of land.
Later in the same month, Dr. Kaelber invited Mr. Knox to spend the week-end with him at Mahwah. Knox was again shown the property. On several subsequent occasions during that fall and the following spring, Knox was a guest at Dr. Kaelber's property. On one of these occasions Dr. Kaelber took him to a peak on the property which he described as "Look-out Point" and which Knox subsequently called "Laurel Crest." Knox was favorably impressed with the beauty of the location.
The doctor suggested that he would like to have a few congenial friends buy parts of the tract and establish a small community thereon. About April 15th, 1936, Knox decided to purchase the "Laurel Crest" site and build a home for himself. The two realized it was necessary to construct a road to the peak before it could be used for dwelling purposes. Thereupon the doctor said he would take care of the road and a right-of-way for telephone and electric power to the building site. The doctor dictated a letter to Knox as evidence of their agreement which reads as follows:
"April 15, 1936.
Mr. H.G. Knox, 22 East 88th St., N YC.
Dear Mr. Knox:
This is to acknowledge receipt from you of $1,000.00 which you and I agreed would bind our bargain of my deeding you free and clear from 25 to 200 acres of my property located near Mahwah, N.J. The specific location and area is to be selected by you any where on said property except within 500 yards of present substantial and permanent buildings. For the above mentioned deed you agreed to invest a total minimum of $11,000.00 for acreage which you may select. *Page 498 
We both understand that a more specific deal shall be consummated within two months based on the above limits of acreage and cash considerations.
 Sincerely yours, F.M. KAELBER."
Mr. Knox took the letter home, had a copy made the next day and wrote across it, "Accepted H.G. Knox." He then mailed the copy together with his check for $1,000 to Dr. Kaelber. Immediately thereafter Mr. Knox left on a business trip and returned about a month later. Upon his return he visited Dr. and Mrs. Kaelber at Mahwah, accompanied by the friend who had originally introduced him to Dr. Kaelber. The chief topic of conversation on this visit was the home which Mr. Knox intended to build.
After this occasion, Mr. Knox frequently asked the doctor when he could begin construction of the house and was told that it would be necessary for Dr. Kaelber to acquire some additional lands known as the "Christie" and the "Winter Mountain, or Lewis" tracts. Dr. Kaelber said he was in the process of obtaining these lands but that some title difficulties were holding up the deal.
Mr. Knox, relying upon the assurances of Dr. Kaelber and trusting him as a close friend, made a series of payments which, with the down-payment, now amount to $10,000.
In September, 1936, at a time when Mr. Knox had paid Dr. Kaelber $6,800, Kaelber informed him that the title difficulties, concerning the tract over which the road was to be constructed, had been settled. Dr. Kaelber then employed one Benjamin, an engineer and surveyor, to lay out the road. When the survey of the road had been completed Dr. Kaelber engaged a contractor, a Mr. VanHorn, to build the road under his supervision. The road was finally completed about the month of February, 1937.
Before the road was finished, Mr. Knox employed contractors, who had been recommended by Dr. Kaelber, to construct a home for him on "Laurel Crest." He caused a well to be dug, a storage shed to be erected and an excavation made for the foundation. By March, 1937, the parties fully understood that Mr. Knox had chosen "Laurel Crest" *Page 499 
as the location for his home. The only matter which still remained to be determined was the quantity of land. Shortly before December, 1936, Knox had attempted to obtain a deed from Dr. Kaelber as he wished to finance part of the construction by a mortgage. The doctor, however, put him off and told him to proceed with his building assuring him that the question of acreage could be settled later. On the strength of this conversation Knox went ahead with the work. Dr. Waugh had viewed the preliminary work in December, 1936, and had knowledge that the improvements were in progress.
By May, 1937, the house, which had cost Knox about $29,000 to erect, was nearly completed. Knox and Kaelber at that time had several conversations relative to the delivery of a deed. As a result, it was then agreed that Dr. Kaelber would lay out a tract of twenty-five acres including the building site and, if the same proved acceptable to Knox, the closing of the title would follow. While Knox was away on a business trip Dr. Kaelber went over the tract with Mr. Benjamin, the surveyor, and pointed out the approximate boundaries and directed him to make a survey. Knox returned about June, 1937, and was shown the survey by Dr. Kaelber. The acreage, as appears from that survey, was 26.2424 acres. Knox stated that the property included in the survey was satisfactory to him and that he would close on that basis. Dr. Kaelber, however, endeavored to induce Knox to acquire a much greater tract in order to protect his property and suggested that Knox seek the services of a competent real estate man.
Knox visited the doctor for a treatment about a week later at which time the doctor again insisted that Knox take a larger tract. After a long conversation Knox suggested that the doctor write him a letter relative to the same. The doctor wrote Mr. Knox a letter dated June 18th, 1937, in which he suggested that Knox purchase 75 to 100 acres at a cost of from $16,000 to $20,000.
Upon receipt of this letter, Mr. Knox, for the first time, procured the services of a lawyer. He then learned that the property on which he had erected his house and other improvements *Page 500 
was owned by Mrs. Kaelber and that Dr. Waugh held a mortgage for about $19,300 on the tract and that Dr. Kaelber had never acquired title to the "Christie" and "Lewis" tracts over which the greater part of the road was laid out. Subsequently, however, about January 17th, 1938, Dr. Kaelber acquired title to the "Christie" tract. The title to the "Lewis" tract was taken in the name of Mrs. Williamson, one of the defendants herein, on or about November 4th, 1937.
Many conferences were held between the parties and their counsel in an effort to settle the matter. Mr. Knox continued to use the house at "Laurel Crest" and also the road which led to his house. However, in August, 1940, Knox found that the road had been blocked by the felling of two trees across the same. On one of these trees appeared a sign which read, "No trespassing. C.B. Williamson."
There appeared to be a complete breakdown in the negotiations between Dr. Kaelber and Mr. Knox and on April 8th, 1939, Dr. Waugh sued out a writ of attachment against Dr. and Mrs. Kaelber for moneys alleged to have been loaned and advanced by him on their behalf. A substantial part of the amount claimed appears to be barred by the statute of limitations. On April 11th, the sheriff executed the writ of attachment and a default judgment was entered against the Kaelbers for $22,365.36.
On August 28th, 1939, complainant filed the bill of complaint in this matter which, among other things, prayed for a restraint against further proceedings in the attachment suit. An adinterim restrain was granted pending final hearing. On July 27th, 1940, Mrs. Kaelber brought an ejectment suit against Knox, whereupon a supplemental bill was filed praying for a stay of the ejectment proceedings.
The case was tried upon the theory that if an enforceable contract were established it would be between the complainant and Dr. Kaelber acting as the duly authorized agent of his wife. Mrs. Kaelber took the stand and testified that her husband had full authority to bind her in the premises and that she concurred in and approved his conduct throughout the entire transaction with Mr. Knox. *Page 501 
I am satisfied from the evidence, that on April 15th, 1936, Dr. Kaelber and Knox reached an oral agreement that the doctor was to sell and Mr. Knox was to buy a parcel of not less than twenty-five acres which included the "Laurel Crest" site. The exact extent of the parcel to be determined by Mr. Knox and the price of the tract to depend on the quantity of land selected, but in no case to be less than $11,000 for the minimum acreage. It appears to me that the letter of April 15th, above mentioned, was not, nor was it intended to be, the contract of the parties but merely evidence that an oral bargain had been concluded.
The fact that no more detailed terms of the agreement were reduced to writing was due to some extent to the inability of Knox to comprehend the real character of his friend, Dr. Kaelber. The principal reason, however, for not reducing the agreement to writing was because Dr. Kaelber lulled his trusting friend into a false sense of security. It was an arrangement between a doctor and his patient who were close friends, or at least Knox was led to believe that the doctor was such. Under the circumstances present here, it can hardly be said that they dealt at arm's length or that Mr. Knox should have been expected to realize that he should so deal with the doctor.
It is quite clear that the doctor's financial condition was not good. The testimony disclosed that he was continually in debt. His principal creditor was his father-in-law, Dr. Waugh. Dr. Waugh's testimony reveals that he too at times was financially embarrassed because of the help he rendered the Kaelbers. I believe that Dr. Kaelber took advantage of his relationship with Mr. Knox to sell him the idea of purchasing the Mahwah property for a substantial sum. It was a simple matter for him to persuade Knox that the peace and quiet of the countryside would be just the thing to mend his shattered nerves. After the doctor had sold Knox the idea, he suggested that Knox look over some Connecticut property apparently with the idea in mind that he had firmly fixed his mind on the Mahwah property. This Knox did but found nothing to his liking. Dr. Kaelber then found himself in a position where Knox was determined *Page 502 
to buy the Mahwah property. The doctor then attempted to evade his bargain apparently being sure that he could induce Knox to part with much more money than he originally intended.
It is well settled that a vendee under an oral contract for the sale of land may have specific performance if there has been such part performance as will take the contract out of the statute of frauds. This is so where the vendee has, with the acquiescence of the vendor, entered into the possession and has either paid the purchase price in full or has made valuable and permanent improvements on the premises.
Knox's possession was certainly with the consent of the vendor and he has erected valuable and permanent improvements. Courts of equity hold that it would be a fraud upon the vendee to permit the vendor to avail himself of the provisions of the statute of frauds after permitting the vendee to rely upon an oral contract and thereby so change his position that it becomes impossible for the parties to be restored to their original positions.
Dr. Kaelber contends the contract is so indefinite and uncertain that it is not capable of enforcement. He argues that a mere designation of quantity is not sufficient to render a contract certain so as to justify the relief of specific performance. A construction of the contract in this case makes it plain that Knox was to have the selection of the property to be conveyed and that it was to include "Laurel Crest" and adjoining acreage. When Knox went over the survey made by Benjamin and stated his complete satisfaction with the area and the location, he exercised his right of selection and thereby rendered the contract certain.
Where a contract gives to one of the parties the right to select the portion to be conveyed and he exercises that right, specific performance is available. See 58 C.J., SpecificPerformance, § 115; Fry, Specific Performance (2d Am. ed.), § 212; Repetto v. Baylor, 61 N.J. Eq. 501. A contract is not considered uncertain because a boundary line is not definitely fixed in the contract, if the parties later agree on a location.Schwarz v. Munson, 94 N.J. Eq. 754. See, also, *Page 503 Bispham, Principles of Equity (8th ed.), § 377, wherein it is said, with reference to the requirement of certainty:
"This rule is, however, subject to two qualifications: first, that specific performance will not be refused if the uncertainty is owing to the fault of the defendant; and, second, that in obedience to the maxim id certum est quod certum reddi potest, performance will be decreed if the means of ascertaining the contract are at hand."
What I have said with respect to the uncertainty of the quantity of land also applies to the uncertainty of the purchase price. When Knox chose to take the premises laid out by the Benjamin survey, the minimum price was $11,000 for twenty-five acres. Since the survey included 26.2424 acres the purchase price, therefore, increased proportionately. Knox, therefore, must pay, in addition to the $11,000, the same proportionate price for 1.2424 acres.
Dr. Kaelber contends that the description from the survey made by Benjamin was not admissible to establish a memorandum in writing under the case of Nibert v. Baghurst, 47 N.J. Eq. 201,
for the reason that it does not refer to the letter of April 15th, 1936. The Nibert Case does not apply here for the reason that the relief sought is predicated upon the existence of an oral contract. The survey was not offered to establish part performance or to prove the existence of the contract but merely to show that Knox exercised his right of selection and thus rendered the contract certain. In the Nibert Case the court found that the parties never reached a definite agreement.
Dr. Kaelber also contends that his letter of June 18th, 1937, in which he suggested the purchase of a larger tract, amounted to a repudiation of the oral contract. This contention is without merit for the reason that Knox had, at that time, disposed of whatever elements of uncertainty existed with respect to the amount of land and the price to be paid.
I conclude that Knox was not at fault for the muddled situation which resulted in this litigation. Dr. Kaelber took undue advantage of their relationship.
I stated at the conclusion of the final hearing that I was doubtful as to whether Dr. Waugh was on notice. My subsequent *Page 504 
study of the record and the testimony leads me to the conclusion that Dr. Waugh had sufficient notice of the transactions between the Kaelbers and Knox.
I am, therefore, satisfied that there is sufficient evidence to support a conclusion that Knox is entitled to have the property in question conveyed to him free and clear of the lien of the Waugh mortgage as well as from the claim of priority under the attachment.
Dr. Waugh knew almost from the beginning that Knox was a potential purchaser of the "Laurel Crest" site. He saw a copy of Dr. Kaelber's letter of April 15th, 1936, and wrote to Dr. Kaelber under date of April 18th, 1936, relative to same.
On cross-examination Dr. Waugh admitted that he knew nearly all there was to be known about the deal; that he knew of Knox's financial standing, his salary and his ability to pay. He also knew of the planning of the residence by Knox; visited the site of the same with him and permitted him to erect improvements on the property without making known to him the existence of his mortgage. He also said: "When the property was purchased Dr. Kaelber was to have the privilege of selling parts of it and paying that off on the mortgage, generally."
It is one of the fundamentals of equity jurisprudence that he who is silent when conscience requires him to speak, shall not be permitted to speak when conscience requires him to be silent. SeeScheck v. Bowne, 113 N.J. Eq. 51.
Dr. Waugh contends that his mortgage was recorded and that, therefore, Knox had constructive notice of its existence. Under the facts in this case, I am of the opinion that Dr. Waugh was in no better position than he would have been if the mortgage had not been recorded. In Todd v. Exeter Land Co., 104 N.J. Eq. 431,
it was said that:
"The fact that the defendants might have discovered the true situation of the title, by examining the records, does not prevent them from setting up an estoppel, under the present circumstances, as pointed out in Sumner v. Seaton, 47 N.J. Eq. 103,
which case also held that `courts of equity have, in many cases, given parties the benefit of an honest supposition *Page 505 
as to title where the slightest examination of the record or other equally available source of information would have disclosed their error. In fact, to exclude the application of the maxim from cases where the party has implied or constructive notice of the title from the record, would confine its application to a very narrow field. * * *'"
When Dr. Waugh started his attachment suit, a substantial proportion of which seems to be barred by the statute of limitations, he wrote letters to the Kaelber creditors advising them that he would guarantee payment for the obvious purpose of deterring them from becoming applying creditors in the attachment suit. The purpose of the suit seemed to be to forestall any claims which Knox might have against the Kaelber real estate.
Dr. Kaelber obtained an option to purchase the "Lewis" tract, above referred to, dated July 10th, 1936. That option provided that the deed should be made to any person whom Dr. Kaelber might designate upon the payment of $10,500. It was necessary to obtain this property in order to construct the road agreed upon between Knox and Kaelber. The road was completed in February, 1937. On November 4th, 1937, at which time the Knox home was nearly completed, Kaelber caused the "Lewis" tract to be conveyed to Mrs. Williamson. The consideration expressed in the deed is $1 and the revenue stamps attached thereto were in the amount of $10.50. Dr. Kaelber had assigned his option to Mrs. Williamson on November 6th, 1937.
Mrs. Williamson obtained the title after the road was completed and with the full knowledge of its existence. Mrs. Williamson was present throughout the hearing but did not take the stand. She was served with interrogatories and her answers to these interrogatories reveal that during the winter months of 1933, 1934, 1938 and 1939 she shared an apartment on Fifth Avenue, New York City, with the Kaelber's; that she visited the Kaelber's home at Mahwah on numerous occasions; that she was generally familiar with the "Lewis" property prior to its purchase, and claimed that she paid $10,000 for the "Lewis" tract, admitting, however, that the payment was made "through Dr. Floyd Kaelber." *Page 506 
Mrs. Williamson's solicitor argues that no relief can be decreed against her and that she did not testify because no case was made out against her. I am convinced, however, that a fraudulent scheme by her and the Kaelbers was disclosed by the evidence in this case.
Since Mrs. Williamson was a close friend of the Kaelbers and since the option to purchase the "Lewis" tract was transferred to her and she knew of the existence of the road thereon, there is a strong inference and, in my mind, a firm conviction that she was a tool of the Kaelbers and participated in the fraud practiced against the complainant. She made no attempt to dispel such an inference by taking the stand and explaining her participation in the transaction.
Mrs. Williamson cannot claim the protection which is ordinarily accorded innocent purchasers for value without notice of the outstanding rights or easements.
Mr. Knox will be protected against any interference with his use of so much of the road as runs through the "Lewis" tract and from any interference with the existing telephone and electric lines running through said tract together with his right to maintain and repair the same.
I have concluded that the attitude of Mr. Knox throughout the transaction and negotiations has been fair and equitable. The defendants' briefs attempt to picture him as endeavoring to drive a hard bargain against the poor defendants. Nothing could be farther from the truth. During his repeated and unsuccessful efforts to compromise the difficulties caused by the unconscionable conduct of the defendants, and down to the present time, Knox has offered and still offers to pay for the reasonable cost of the road.
All counsel in the case have agreed that the reasonable cost of the road is $6,500. Mr. Knox will, therefore, be credited to the extent of $6,500 for the cost of the road on account of the $10,000 which he has already paid, which leaves a balance of $3,500 to be applied on the cost of the "Laurel Crest" tract containing 26.2424 acres.
I will advise a decree in accordance with these views. *Page 507